**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN GERBER, on behalf of himself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| ENERGIZER HOLDINGS, INC. and WAL-MART INC., | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Stephen Gerber ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following Class Action Complaint against the above-captioned Defendants, Energizer Holdings, Inc. ("Energizer") and Wal-Mart, Inc. ("Walmart") (Energizer and Walmart are referred to herein collectively as "Defendants") upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

**I.     NATURE OF THE ACTION**

1.     For over half a century, batteries have been a staple in American homes. Consumers have used them for a multitude of household purposes, including for cooking appliances, medical devices, radios, flashlights, cordless phones, and other electronics.  According to Statista, in 2020, Americans bought over $5 billion dollars-worth of household-use batteries; meaning, Americans consume roughly $15 worth of household-use batteries per person, per year.

2.      About half of all batteries purchased for household use are disposable batteries, while the other half are rechargeable batteries.  Generally, disposable batteries differ from rechargeable batteries in that they are disposed after use and cost significantly less at retail.  This Action, which is specific only to the market for disposable batteries in the United States (the "Relevant Market"), focuses on the conduct of a monopolist in the United States' disposable batteries market, Energizer.

3.      Both Defendants have an outsized role to play in the Relevant Market.  Energizer is the largest producer of disposable batteries in the United States, and Walmart is the largest distributor of said batteries in the United States.  Energizer has an over 50% market share in the Relevant Market.  Walmart, the largest retailer in the world, is responsible for between 8.5% and 20% of Energizer's overall sales per year between 2012 and 2021.  Both Energizer and Walmart have profited and continue to profit from the sale of Energizer's batteries through Walmart's channels of online and in-person commerce.

4.      As the Relevant Market suffered due to advances in technology (*e.g.*, less need for batteries in electronics products) as well as the rising popularity of rechargeable devices such as smartphones, computers, and electronics appliances, disposable battery use has become increasingly confined to low-tech applications like flashlights, television remotes, smoke alarms, and other small, less sophisticated devices.  Consumers, too, have become less enthusiastic regarding disposable batteries in light of the negative environmental impact of disposable batteries and are therefore purchasing less disposable batteries as compared to previous generations. Finally, many of the uses for batteries (such as remote-control devices for televisions) have been replaced by applications on smartphones, which rendered many of the aforementioned low-tech uses for disposable batteries obsolete.

5.      Faced with this new reality, rather than innovate or create new ways to sell products to consumers, Defendants instead chose to violate federal and state antitrust laws in order to line their pockets to the detriment of American consumers.

6.      Defendants took a two-pronged approach in an overarching conspiracy to fix, raise, stabilize, or otherwise illegally impact prices in the Relevant Market, causing consumers to pay supracompetitive prices for Energizer's disposable batteries.  The way that this was done is as follows.  First, Energizer agreed to inflate its wholesale prices above competitive levels in the Relevant Market to its direct consumers other than Walmart.  The resulting distortion of prices allowed Walmart to elevate its retail prices above competitive levels, forcing non-Walmart retailers, like the ones that Plaintiff and the members of the Class purchased from, to charge higher prices at retail than they otherwise would have.  Second, Energizer agreed with Walmart to an unlawful pact, under which all non-Walmart retailers, like the ones that Plaintiff and the members of the Class purchased from, were required to charge prices for disposable batteries that were equal to or greater than the prices offered at Walmart.  Put differently, any competitor of Walmart could sell Energizer batteries, so long as Walmart was not undercut on price to consumers.

7.      To advance the goal of reaping supracompetitive profits from the conspiracy, and to protect Walmart's sale of Energizer's disposable batteries, Energizer created a team known internally as "Project Atlas."  Project Atlas policed Energizer's non-Walmart customers' retail prices.  If these competitors tried to undercut Walmart on price for Energizer's disposable batteries, they would be admonished by Energizer.   This corrupted any competition within the Relevant Market for disposable batteries at any store that sold Energizer's disposable batteries other than Walmart, thereby depriving consumers of choice, quality, and the ability to shop around for better prices (*i.e.*, competitive pricing).

8.      To further advance the goal of reaping supracompetitive profits from the conspiracy, and to protect Energizer's market share of Energizer's disposable battery sales in Walmart's stores, Walmart allowed Energizer's largest competitor (Duracell) to sell its products at Walmart *only* at the same or higher prices than that of Energizer.  This corrupted any competition internally in Walmart's stores for disposable batteries and kept Energizer from being undercut in the Relevant Market, thereby depriving consumers of choice, quality, and competitive pricing in the Relevant Market.

9.      Individually and collectively, both prongs of the conspiracy caused consumers who bought Energizer disposable batteries at any retailer other than Walmart to pay supracompetitive prices for those batteries.  As such, Plaintiff, on behalf of himself and all others similarly situated who bought disposable batteries in the Relevant Market from January 1, 2018 through the present ("Class Period"), brings this Action against Defendants under Section 1 of the Sherman Antitrust Act and state antitrust laws to recover actual damages, treble damages, statutory damages, injunctive relief, and equitable relief for restraints of trade.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under Section 16 of the Clayton Act to secure injunctive and declaratory relief against Defendants for violating Section 1 of the Sherman Antitrust Act (15 U.S.C. 1).

11.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, as there are over 100 putative class members, the damages alleged exceed $5,000,000 exclusive of costs and interest, and there is minimal diversity – namely, Plaintiff is from a different state than at least one Defendant.  In particular, Plaintiff is a New York resident

whereas Defendant Walmart is a resident of Arkansas and Defendant Energizer is a resident of Missouri.

12.     This Court has personal jurisdiction over each Defendant because, *inter alia*: (a) the Defendants transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of disposable battery products throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

13.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

14.     Venue is appropriate in this District because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

### III.     PARTIES

*Plaintiff*

15.     Plaintiff Stephen Gerber is and was a New York resident at all times relevant to this Action.  During the Class Period, and while residing in New York, Plaintiff purchased Energizer batteries from a retailer other than Walmart for his own use and not for resale.  Plaintiff suffered

injury in the form of overpayment for disposable batteries as a result of the conduct as alleged herein.

### Defendant Energizer Holdings, Inc.

16.     Defendant Energizer Holdings, Inc., a leading manufacturer of disposable batteries, is based in Missouri.

### Defendant Wal-Mart Inc.

17.     Defendant Wal-Mart Inc., which operates thousands of retail stores in the United States, is based in Arkansas.

## IV.     FACTUAL ALLEGATIONS

### A.  The Disposable Battery Market

18.     Disposable batteries are single-use power sources and are typically powered by alkaline or lithium.  Disposable batteries come in standard sizes (*e.g.*, AA, AAA, etc.), defined according to standards adopted by the American National Standards Institute or International Electrotechnical Commission.  Disposable batteries are used in toys, flashlights, remote-controls, smoke detectors, and some power tools, among many other similar electronic devices.  Disposable batteries are mature products that have seen little innovation in the last several decades.

19.     The disposable batteries industry is characterized by high barriers to entry.  Many disposable batteries contain cobalt, lithium, and graphite, which are considered critical minerals by the United States Geological Survey, *e.g.*, minerals with a high supply risk potential and for which there are no easy substitutes.

20.     Safety concerns and regulations impose additional substantial barriers to entry. Disposable batteries are manufactured using metals such as mercury, lead, cadmium, and nickel. Lead and mercury are hazardous materials, and waste from battery manufacturing creates costly

environmental contamination problems.  As such, legacy battery manufacturers (with in-place manufacturing capacity and associated regulatory permits) have a strong advantage over any would-be new entrants to the market.

21.    Advertising is another barrier to entry for new entrants into established markets like the disposable battery market.  Energizer has invested hundreds of millions of dollars in advertising to build its brand.  Energizer spends an estimated $70-80 million a year in advertising, principally to distinguish itself from Duracell, its chief rival.  Energizer and Duracell together account for approximately 85% percent of total U.S. disposable battery sales, and Energizer by itself accounts for over 50% of those sales.  Each company has market power.

22.    The recent market outlook for disposable batteries has been bleak. The conventional wisdom is that with advances in technology, and the rising popularity of smartphones, videogames, and online games, alkaline battery use will increasingly be limited to flashlights, smoke alarms, and a few other low-tech applications.

23.    High technology and advanced circuitry also increasingly produce smaller consumer devices that are powered with rechargeable or renewable power sources, further limiting disposable battery use.

24.    Consumer demand for disposable batteries has also been dampened by environmental concerns.  Many consumers appropriately prefer rechargeable batteries to protect the environment.

25.    Disposable batteries thus face a declining market outlook, have been losing sales to renewable batteries, and are being displaced by new technology in devices that do not require batteries to operate.

### B. *Walmart's Dominance in Retail Sales Makes It A Critical Seller for Battery Manufacturers*

26.     At the retail level for disposable batteries, there is a single dominant firm, Walmart.

27.     Walmart is the only retailer Energizer references in Energizer's annual SEC filings: "Although a large percentage of our sales are attributable to a relatively small number of retail customers, in fiscal year 2020, only Wal-Mart Stores, Inc. accounted for ten percent or more (14.1%) of the Company's annual sales."

28.     Walmart has historically been a large part of Energizer's revenues.

29.     In 2013, Energizer lost an exclusive contract with Walmart to supply batteries to Walmart's discount chain, Sam's Club.

30.     The effect that losing the contract had on Energizer's sales illustrates Walmart's dominance as a retailer and its importance to Energizer.  The year before losing the contract, Walmart purchases constituted 20% of Energizer's overall sales.  Just one year later, that percentage dropped to 13.3%, and the next year, to 8.5%.

31.     The drops in sales to Walmart had corresponding effects on Energizer's bottom line:  Energizer missed earnings and profit estimates in 2014 and 2015, and its share price suffered.

### C. *The Defendants Agree to the Conspiracy*

32.     As early as January 2018, Walmart and Energizer again agreed to a deal that would give Energizer's products preferential treatment in Walmart stores, and the downward trend reversed.  After falling to as low as 8.5%, Energizer's Walmart sales rebounded to around 14% of all Energizer sales starting in 2019.

33.     Walmart and Energizer's agreement extended beyond Walmart giving Energizer disposable batteries preferential treatment at its stores.  Under pressure from Walmart, Energizer

agreed to the conspiracy, which shielded Walmart from price competition from other retail sellers of Energizer batteries and allowed both Walmart and Energizer to charge supracompetitive prices.

34.     The conspiracy had two components.  First, Energizer agreed with Walmart to artificially inflate the wholesale prices it charged to Walmart's competitors for Energizer batteries to prevent them from undercutting Walmart's retail prices.  Second, Energizer agreed with Walmart to monitor Walmart's competitors to ensure that those competitors did not charge lower retail prices for Energizer batteries than Walmart, and to discipline those competitors that did.

35.     Energizer created a group called Project Atlas to fulfill its obligations to Walmart under the agreement. Project Atlas policed Energizer's customers' retail prices and raised wholesale prices as necessary to force Energizer's customers to maintain retail prices that did not undercut Walmart's.

### D.  Energizer and Walmart Implement the Conspiracy

36.     By April 2018, Energizer had increased its prices by over 8% from the prior year.

37.     That same year, at Walmart's behest, and in furtherance of the conspiracy, Energizer's Project Atlas policed Walmart's competitors' retail prices for Energizer batteries and disciplined competitors and other retailers for underselling Walmart,.

38.     For example, in November 2018, Project Atlas disciplined Walmart's horizontal competitor in the Relevant Market, Portable Power, Inc. ("Portable Power"), for its pricing of Energizer headlamps, a battery product sold by Walmart and, at that time, Portable Power.

39.     Acting on complaints from Walmart, Energizer raised its wholesale prices for headlamps to Portable Power to, in turn, force Portable Power to raise its retail prices to match or exceed Walmart's.

40.     As explained in an internal email sent by Energizer manager Jeffrey Stoll, Energizer had received complaints from Walmart regarding "disruptive pricing on Amazon & Wal-Mart.com on headlights and specialty batteries."   Walmart asked Energizer what it was doing to "resolve" the issue.

41.     Mr. Stoll mentioned Portable Power by name as a driver of the "disruptive pricing."

42.     Mr. Stoll's email highlighted Portable Power as selling at "disruptive" prices — *i.e.*, lower and more competitive prices — and noted the link between reining in Portable Power's retail pricing and Energizer's efforts to maintain high prices across retail distribution channels.

43.     Energizer recognized the disruption that competitors such as Portable Power would have on Walmart's sales of Energizer batteries generally.  Raising prices to Portable Power and Energizer's other direct purchasers would have the effect of diminishing competition in the retail market, to the benefit of Walmart.

44.     Energizer understood that raising wholesale prices to Portable Power and other retailers would increase retail prices.

45.     Energizer explained that, with headlamps as well as other battery products: "[W]e are selling to Portable Power, Inc. at [wholesale] pricing that would allow them to be disruptive on e-commerce. Anything we can do to influence pricing with Portable Power will be key to reducing the disruption in the [North American] market."

46.     To bring Portable Power's retail pricing up to the level of Walmart's pricing, Energizer raised its wholesale prices to Portable Power for headlamps by about 50-85%.

47.     At that time (in November 2018), Energizer's Stephanie Rice, a sales representative that worked with Portable Power, told Portable Power's CEO that Energizer was raising Portable

Power's prices to align them with Energizer pricing policy.  Energizer did not tell Portable Power that the price increases Energizer was imposing were because of the conspiracy.

48.     This policy was new to Portable Power, which had purchased disposable batteries and battery products from Energizer for years and represented a material change in Energizer's pricing policy.

49.     Additionally, and critically to consumers like Plaintiff and members of the Class, Energizer also began rolling out widespread wholesale price increases for direct purchasers other than Walmart in accordance with the conspiracy.

50.     For example, in the second quarter of 2019, Energizer announced an 8% price increase for its Energizer® Max Alkaline Batteries and Energizer® Ultimate Lithium Batteries.

51.     This announced price increase enabled Walmart to increase its prices for these batteries by an even greater margin: nearly 20% in the third quarter of 2019, and by nearly 40% by the first quarter of 2020.

52.     In May 2019, the month before the price increase was announced, Walmart priced a 24-pack of Energizer Max Alkaline AAA batteries at $12.78.  By July 2019, just two months later, Walmart had raised the price to $16.24, *a 27-percent increase*.  This price change was non-transitory.  The average price of this product in the 12 months before the wholesale price increase was $12.71, and the average price in the 12 months after the wholesale price increase was $16.18.

53.     Energizer continued to impose similar price hikes at regular intervals in 2020 and 2021.

54.     In September and October 2020, Energizer raised prices across its product lines by at least 10%.  In April 2021, Energizer raised prices on its MAX line of batteries by at least 10%. And in June 2021, Energizer raised prices across its household battery portfolio by 11%.

55.     Energizer implemented its price increases because of its agreement with Walmart and at Walmart's behest.

56.     Energizer understood that raising its wholesale prices to its direct customers would, in turn, increase the retail prices its direct customers charged at retail.  These price increases were intended to force retailers competing with Walmart in selling Energizer disposable batteries to increase their retail prices up to or above Walmart's.

57.     In January 2021, Energizer again targeted Portable Power for underselling Walmart.

58.     Ms. Rice forwarded an email from Energizer's Project Atlas team to Portable Power's CEO, informing him that Portable Power was among the top-ten Amazon sellers "in violation" of Energizer's "pricing policies" — meaning, Portable Power's retail prices were below the price floor Energizer had set with Walmart for December 2020.

59.     An internal email communication from Energizer's Colby Mowery, a member of Energizer's trade and price strategy team, to Energizer manager Brad Sellenriek confirmed that Energizer's Project Atlas had contacted Portable Power because of Energizer's agreement with Walmart.

60.     Mr. Sellenriek forwarded the message to Ms. Rice and clarified that Portable Power was being asked to raise its retail prices:  "Stephanie- Please see the latest situation on [Portable Power]. Before we shut them off on these [products], let's see if he's willing [to] revise his pricing and get him off the radar."

61.     Following these messages in January 2021, Energizer increased various wholesale prices to Portable Power for Energizer batteries in accordance with its agreement with Walmart.

Energizer also told Portable Power the minimum price it had to charge (*e.g.*, Walmart's price to avoid being terminated as a distributor.

62.     Energizer repeatedly warned Portable Power that if Portable Power did not increase its retail prices to match or exceed Walmart's, it would be cut off from purchasing batteries from Energizer.

63.     On or about February 1, 2021, Ms. Rice warned Portable Power that, because Portable Power had not raised its retail prices to match Walmart's, Energizer would stop shipping certain Energizer batteries to Portable Power.  When Portable Power's CEO discussed Energizer's decision with Ms. Rice later that day, she admitted that Energizer had adjusted its pricing policies at Walmart's request, telling him "This is 1000% about Walmart and wanting the best price."

64.     According to Ms. Rice, Energizer inflated its wholesale prices for Energizer batteries to Portable Power and other wholesalers to force them to sell at or above Walmart's retail prices.

65.     Later that month, Energizer again quoted wholesale prices to Portable Power that were based on Walmart's prices, this time for Ray-O-Vac hearing aid batteries.

66.     Ms. Rice again said that Energizer was requiring Portable Power to match a floor created by Walmart's price for these products.  In an email message dated February 16, 2021, Ms. Rice offered Portable Power a wholesale price that would allow it a 20% markup if it matched Walmart's retail price: "If the items are priced to match the Walmart selling price minus 20% would that work for you?"

67.     Ms. Rice was offering a wholesale price to Portable Power that was 20% below Walmart's retail price so that Portable Power could have a sufficient markup if it set its retail prices at or above Walmart's retail prices.

### E.  Market Forces Cannot Explain Energizer's Price Increases

68.     Energizer's price increases cannot be explained by other market forces. The price of lithium was flat or declining for the periods before and after the announced price increases.  The cost of the four other commodities that make up 90% of the inputs to disposable batteries — steel, graphite, manganese, and zinc — also do not explain Energizer's price increases.

69.     Increased demand does not explain Energizer's wholesale price increases either. Energizer battery prices, like disposable battery product prices generally, have been increasing in the last four or five years despite a reduction in demand because of competition from disruptive technologies, as detailed above.

70.     On April 17, 2018, the *Wall Street Journal* reported that price increases at both Energizer and Duracell — which together control about 85% of the market for Alkaline batteries — were at odds with competitive market forces: "Batteries on average cost 8.2% more than a year ago, while prices in the overall household-care segment rose only 1.8%, according to Nielsen.  At a time when prices are stagnating on everything from toilet paper to diapers, such pricing power for a product that is increasingly obsolete has confounded shoppers."

71.     Nor can the price increases be explained by general inflation.  Inflation was under 2% when Energizer announced its 2019 and 2020 price increases, 2.6% in March 2021 when Energizer announced its 10% price increase, and 5% in May 2021 when it announced its 11% price increase.

### F.  The Conspiracy Benefits Walmart and Energizer to the Detriment of Competition

72.     The conspiracy benefited both Walmart and Energizer.  First, Energizer agreed to inflate its wholesale prices to Walmart's competitors.  That enabled Energizer to enjoy inflated

prices paid by those competitors.  It also enabled Walmart to artificially inflate its retail prices for Energizer batteries without being undercut by other retail sellers of Energizer batteries.

73.    Second, Energizer agreed to prevent its direct purchasers from undercutting Walmart's retail prices.  Energizer further inflated its prices to retailers, like Portable Power, that chose to compete on price, ultimately driving them out of the market if they did not comply.  That enabled Walmart to artificially inflate its prices by an additional increment.

74.    The greatest potential threat to the conspiracy was Duracell.  Duracell could have attempted to gain market share from Energizer through pricing.  But Walmart deprived Duracell of the single largest opportunity to compete: Walmart stores.  Walmart protected its own inflated prices for Energizer batteries by charging similarly inflated prices for Duracell batteries.  That benefited Walmart.  It also protected Energizer from its greatest competitive threat.  With Walmart stores unavailable for price competition, Duracell had a material incentive to charge higher prices to its direct purchasers than it would have charged in the absence of the conspiracy.

75.    In this way, the conspiracy facilitated inflated duopolistic pricing and vice-versa. On one hand, the anticompetitive agreement supported higher duopolistic prices than Energizer and Duracell would have otherwise charged.  The conspiracy distorted Duracell's incentives, making it less attractive for Duracell to compete on price and more attractive to match Energizer's prices.  On the other hand, the duopolistic Relevant Market was particularly susceptible to the conspiracy.  Conspiracies to artificially inflate prices are more likely to succeed and more stable in markets with, as here, a small number of dominant market players.

### G.  The Conspiracy Harms Competition and Consumers Alike

76.    While the conspiracy caused antitrust injury to both companies' direct competitors, the largest harm caused is the harm to consumers who purchase disposable batteries as affected by

this conspiracy.  This is because, indirect purchasers, like Plaintiff and Class members, cannot pass off the overcharges they incur from the purchases made in the Relevant Market.  In contrast, direct purchasers, like Portable Power and other retail stores (*i.e.*, Target, Amazon, Costco, etc.) can at least try to pass along Energizer's overcharges to consumers.

77.     Consumers were harmed in the form of reduced price competition, higher prices in the Relevant Market for Energizer's disposable batteries, reduced choice, throttled incentives for innovation, and stagnated product offerings.

78.     This is due, in part, because (i) direct purchasers are being sold products at inflated prices at retail due to Energizer's pricing decisions and agreements with Walmart, and (ii) the agreement between Walmart and Energizer does not allow Energizer to sell Energizer's disposable battery products at other retailers for cheaper prices, which has the effect of fixing the entire market for Energizer's products.  And, because Energizer represents over 50% of the Relevant Market, and because of the effects on Duracell's pricing as detailed herein, consumers do not have a choice but to pay supracompetitive or inflated prices for products in the Relevant Market.  Energizer's reaping of supracompetitive profits and insulated market share allow it to continue to raise prices on consumers.  Further, the policing of other retailers who do not price in lockstep with Walmart hurts consumers who do not purchase directly from Walmart, like Plaintiff and the putative Class members, who are forced to pay at least a much as the prices that Walmart charges.

### H.  The Relevant Market and Market Power

79.     The relevant product market consists of the market for disposable battery products. There are no reasonable substitutes for disposable batteries for the vast majority of uses for which they are purchased.  Rechargeable batteries are not reasonable substitutes for disposable batteries because they are significantly more expensive and do not hold a charge as long.  This makes them

an impractical choice for the types of applications for which disposable batteries are usually used, particularly applications that require low power output or infrequent power draws for a longer period of time than rechargeable batteries, such as for smoke alarms, children's toys, flashlights, etc.

80.     The relevant geographic market consists of the United States, and its territories, possessions, and the Commonwealth of Puerto Rico.

81.     Energizer has substantial market share within the Relevant Market, controlling more than 50% of the market.  Most of the rest of the market belongs to Duracell.  Together with Duracell, Energizer has duopoly power, as explained above.

82.     Energizer's power in the market for disposable battery products also gives it power over price and market power over disposable-battery dominated products.

83.     Direct evidence establishes Defendants' combined power in the Relevant Market and over all disposable battery products.  That direct evidence includes Defendants' ability to inflate prices above competitive levels profitably and sustainably.  It also includes: (i) Energizer's multiple large price increases since January 2018 that it implemented under its agreement with Walmart and that cannot be explained based on competitive forces; and (ii) the decrease in the number of retail sellers that purchase batteries directly from Energizer even though the retail prices for those batteries are inflated above competitive levels.

84.     Defendants' conduct had a significant impact on prices for Energizer and Duracell batteries, and has inflated Energizer's, Duracell's, and Walmart's prices above competitive levels and driven distributors off the market.  Reducing competition from retail sellers reduces price competition at the retail level.

85.     As shown by Energizer's significant price inflation alleged herein, inter-brand competition did not restrain Energizer from inflating its prices.  On the contrary, Energizer's agreement with Walmart reduced price competition between Energizer and Duracell by encouraging Duracell to follow Energizer's price increases and reducing Duracell's incentive to compete with Energizer on wholesale pricing.  Walmart's agreement with Energizer made it easier for Duracell to observe Energizer's price changes and prevented Duracell from competing with Energizer for market share by lowering its prices to Walmart, as Walmart refused to sell Duracell batteries at prices that would undermine the effects of the Scheme.

86.     During the conspiracy period, Energizer had market power in the wholesale market for disposable batteries because Energizer had the power to profitably exclude competition and to inflate and maintain the prices for those products at supracompetitive levels.

87.     The fact that Energizer was able to profitably inflate the prices of Energizer disposable batteries shows that there are no sufficiently reasonable substitutes, and therefore that disposable battery products are a relevant market.

88.     Walmart has a dominant position with respect to both other retail outlets and manufacturers.

### I.   Anticompetitive Effects

89.     The conspiracy caused Energizer's direct purchasers to pay inflated wholesale prices for Energizer batteries, impairing their ability to compete effectively with Walmart in the retail market.  These wholesale prices where then passed down to consumers, like Plaintiff and the Class members, who suffered the ultimate downstream injury due to Energizer and Walmart's collective conduct.

90.    Defendants' conspiracy increased and insulated Energizer's market power by reducing competition between Energizer and Duracell, augmenting Duracell's incentive to match Energizer's price increases, and reducing the risk that Energizer would lose market share if it inflated its prices above competitive levels.

91.    The conspiracy enabled Energizer to implement a series of anticompetitive wholesale price increases.  The price increases started in 2018 and accelerated in 2020 and 2021. The wholesale prices Energizer charged direct purchasers increased by more than 30% since 2018, and the number of retail sellers of Energizer disposable batteries in the market decreased during that time.

92.    The price increases identified above cannot be adequately explained by general inflation in the economy or other competitive market forces.

93.    The conspiracy also reduced competition on the retail level by impairing retailers from gaining market share by offering retail prices for Energizer batteries lower than Walmart's. As a result, the conspiracy increased Walmart's market power and caused consumers, like Plaintiff and the putative Class members, to pay supracompetitive prices at retail at any other location other than Walmart.

### J.    *Statutes of Limitation Do Not Bar Plaintiff's Claims*

#### A.    *Continuing Violation*

94.    During the conspiracy, Defendants' conduct entailed a continuing violation in which Defendants repeatedly invaded Plaintiff's and Class members' interests by taking overt acts in furtherance of the conspiracy.

95.    Throughout the conspiracy, Defendants discussed the conspiracy, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their

agreement against retailers who attempted to undercut Walmart's retail prices for Energizer's disposable batteries.

96.     Throughout the conspiracy, Defendants' repeatedly injured Plaintiff and Class members by causing them to pay overcharges each time they purchased Energizer disposable batteries.

### B.   Fraudulent Concealment

97.     The statute of limitations is tolled because Defendants fraudulently concealed their conspiracy.

98.     Defendants actively concealed their conspiracy by having Energizer offer pretextual justifications to Walmart's competitors when it raised wholesale prices and forced them, in turn, to raise their retail prices.  In reality, Energizer was enforcing the terms of the conspiracy.

99.     Plaintiff and the Class members did not have actual or constructive knowledge of the facts constituting their claim for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy.

## V.    CLASS ALLEGATIONS

100.    Plaintiff seeks to bring this Action as a Class Action pursuant to F.R.C.P. Rule 23 and seeks certification of the following Classes (collectively referred to herein as the "Class"):

**Nationwide Class.**  All persons and entities throughout the United States who purchased Energizer disposable batteries at retail from any retailer other than Walmart from January 1, 2018 until the anticompetitive effects of the Defendants' challenged conduct ceases.

**New York State Subclass.** All persons and entities throughout the state of New York who purchased Energizer disposable batteries at retail from any retailer other than Walmart from January 1, 2018 until the anticompetitive effects of the Defendants' challenged conduct ceases.

101.    Excluded from the Classes are Defendants, their officers and directors, and members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded is the judge presiding over this matter, the judge's staff members, and the judge's and the judge's staff members' immediate families and their legal representatives, heirs, successors, or assigns.

102.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable.  After a reasonable opportunity for further investigation or discovery, the evidence is likely to show that the Class members number in the thousands.

103.    **Typicality.** The claims of Plaintiff are typical of the claims of members of the Class, entities and persons that are similarly affected by Defendants' wrongful conduct in violation of the laws complained of herein.  Plaintiff purchased disposable batteries indirectly from Energizer during the Relevant Time Period and was injured thereby.  Plaintiff's injuries are typical of injuries of the members of the Class, all of whom also purchased Energizer batteries indirectly from Energizer during the Relevant Time Period.

104.    The interests of Plaintiff do not conflict with those of other members of the Class.

105.    **Commonality.** Questions of law and fact common to the members of the proposed Classes include:

        a.   Whether the Defendants agreed to the conspiracy;

        b.   The nature, scope and extent of the conspiracy;

        c.   Whether retail competition for the sales of Energizer batteries were impaired by the conspiracy;

        d.   Whether the conspiracy violates the Sherman Act and/or the Donnelly Act;

e.   Whether the conspiracy is *per se* illegal under the Sherman Act or the Donnelly Act;

f.   Whether, alternatively, the conspiracy is unlawful under the rule of reason;

g.   Whether Plaintiff and the other Class members were harmed by the conspiracy;

h.   The appropriate measure of classwide damages; and

i.   Whether the Court should grant injunctive and equitable relief to remedy and prevent the continuing harm caused by Defendants, and, if so, to what extent.

106.   **Predominance.**   The above issues predominate over all issues affecting only individual Class members.

107.   **Superiority.**   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.   Furthermore, as the damages suffered by some of the individual Class members is relatively small, the expense and burden of individual litigation makes it impractical for members of the Classes to redress the wrongs done to them.   Litigating hundreds of individual cases also would inevitably lead to inconsistent rulings and results, unnecessarily burden the judicial and legal system, and magnify the delay and expense to all the parties.

**VI.    CAUSES OF ACTION**

<u>**COUNT I**</u>

**VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACTION**

**(FOR INJUNCTIVE AND DECLARATORY RELIEF – NATIONWIDE CLASS)**

108.   Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

109. Beginning at least as early as when the Class Period started, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize the prices for disposable battery products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. Sect. 1).

110. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants agreed, combined and conspired to: fix, raise, or stabilize the price of Energizer's battery products.

111. The combination and conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of battery products has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for battery products sold by the Defendants and all of their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased battery products indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

112. Plaintiff and members of the Class have been injured and will continue to be injured financially by paying more for batteries purchased indirectly from Energizer for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

113. Plaintiff and members of the Class are entitled to declaratory relief as well as an injunction against the Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### VIOLATIONS OF STATE ANTITRUST STAUTES

### (VIOLATION OF THE DONNELLY ANTITRUST ACT – N.Y. GEN. BUS. LAW 340)

### (NEW YORK STATE SUB-CLASS)

114.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

115.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

116.    Plaintiff purchased battery products within the State of New York during the Class Period indirectly from Energizer.  But for Defendants' conduct set forth herein, the price of disposable batteries would have been lower, in an amount to be determined at trial.

117.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law § 340(6).

118.    Defendants restrained competition in the free exercise of the conduct of the business of disposable batteries production within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

119.    Plaintiff and members of the New York Sub-Class were injured with respect to purchases of battery products in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

120.    There is no legitimate, non-pretextual procompetitive business justification for Defendants' conspiracy that outweighs its harmful effects.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

121.    The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated by the acts as discussed both above and below.

122.    The conspiracy had the intended effect, as Defendants benefited from their restraints of trade on battery products and the elimination of competition, which both artificially inflated the prices of Energizer disposable batteries for consumers who purchased said batteries indirectly.

123.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their business and property in that they have now paid more for battery products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class members pray for the following relief:

a.    Certification of the Action as a Class Action pursuant to F.R.C.P. Rule 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

b.    The conduct alleged be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Antitrust Act and of the Donnelly Act;

c.    A judgment for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, equitable relief, penalties, and other monetary relief provided by applicable law, including trebled damages;

    d.  Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the service of the initial complaint in this Action;

    e.  Awarding Plaintiff and the costs of this suit, including reasonable attorneys' fees;

    f.  Such injunctive relief as appropriate to remedy the significant threat of continuing injury posed by Defendants' violations of the antitrust laws; and

    g.  Such other and further relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

124.  Plaintiff on behalf of himself and all others similarly situated hereby requests a jury trial on any and all claims so triable.

DATED:    May 1, 2023          Respectfully Submitted,

                                /s/ *Israel David*
                                Israel David
                                Blake Hunter Yagman
                                **ISRAEL DAVID LLC**
                                17 State Street, Suite 4010
                                New York, New York 10004
                                Tel.:   212-739-0622
                                Fax:   212-739-0628
                                Email: *israel.david@davidllc.com*
                                          *blake.yagman@davidllc.com*

                                *Attorneys for Plaintiff and the Proposed Class*